UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL LIBERTIES UNION FOUNDATION, | |
| Plaintiffs, | |
| v. | Civil Action No. 24-cv-5722 (JSR) |
| DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION, AND DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

## DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

1.      I am the Section Chief of the Record/Information Dissemination Section (RIDS), Information Management Division (IMD), Federal Bureau of Investigation (FBI), Winchester, Virginia. I joined the FBI in September 2011, and prior to my current position, I was the Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation Support Unit, from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of the General Counsel, Freedom of Information Act (FOIA) Litigation Unit, from September 2011 to November 2012. In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act (FOIPA) litigation cases nationwide. Prior to joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration (DEA), from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits

1

nationwide. I also served as a U.S. Army Judge Advocate General's Corps Officer in various assignments from 1994 to September 2006 culminating in my assignment as Chief, General Litigation Branch, U.S. Army Litigation Division, where I oversaw FOIPA litigation for the U.S. Army. I am an attorney licensed in the State of Ohio and the District of Columbia.

2.      In my official capacity as Section Chief of RIDS, I supervise approximately 211 FBI employees, supported by approximately 97 contractors, who staff a total of eight (8) Federal Bureau of Investigation Headquarters (FBIHQ) units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3.      Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the FBI's handling of Plaintiffs' FOIA request that is the subject of this litigation.

4.      In response to Plaintiffs' requests, the FBI processed a total of 396 pages of responsive records subject to the FOIA. Of these pages, the FBI released 50 pages in full, released 155 pages in part, and withheld 191 pages in full for the following reasons: the pages

were exempt in full pursuant to one or more applicable FOIA exemption(s) or the pages were found to be duplicative of other pages accounted for elsewhere in the FBI's production.

5.    The FBI submits this declaration in support of Defendant's Motion for Summary Judgment. Part I of this declaration provides the Court with a summary of the administrative history of Plaintiffs' request; part II describes the procedures used to search for responsive records; and part III, in accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), provides the FBI's justification for withholding information in part or in full pursuant to FOIA Exemptions 3, 6, 7(C), and 7(E). 5 U.S.C. § 552 (b)(3), (b)(6), (b)(7)(C), and (b)(7)(E).

## PART I: ADMINISTRATIVE HISTORY OF PLAINTIFFS' REQUESTS

6.    By eFOIA dated May 21, 2024, Plaintiffs submitted a four-part FOIA request to the FBI seeking the following groups of records:

> 1. All final policies, guidance, procedures, directives, advisories, memoranda, agreements, training materials, and/or legal opinions created from January 20, 2017, to the present, pertaining to:
>
>    a. The use of JTTFs and/or fusion centers to collect information about, monitor, surveil, observe, question, interrogate, and/or investigate individuals or organizations engaged in protest;
>
>    b. The activities and/or predicate criteria that trigger JTTF and/or fusion center involve1nent, including the legal justification and/or factual showing required;
>
>    c. Intra-agency correspondence and correspondence among federal, state, and local law enforcement agencies pertaining to monitoring, surveilling, observing, questioning, interrogating, and/or otherwise investigating individuals or groups engaged in protest through or by JTTFs and/or fusion centers;
>
>    d. The collection, storage, use, and/or dissemination of data (including photographs, videos, and electronic surveillance records) obtained during and/or in connection with monitoring of individuals or groups engaged in protest through or by JTTFs and/or fusion centers; and
>
>    e. JTTFs and fusion centers' protection of privacy, civil rights, and civil liberties.

2. Records created from January 20, 2017, to the present, indicating:

    a. The number of individuals whose activities have been investigated through or by JTTFs and/or fusion centers in connection with protests; and

    b. The number and na1nes of groups whose activities have been investigated through or by JTTFs and/or fusion centers in connection with protests

3. Records created from January 20, 2017, to the present concerning the definition of the following terms as used and applied by JTTFs and/or fusion centers:

    a. "Racially or Ethnically Motivated Violent Extremism"
    b. "Anti-Government or Anti-Authority Violent Extremism"
    c. "Animal Rights or Environmental Violent Extremism"
    d. "All Other Domestic Terrorism Threats"
    e. "Abortion-Related Violent Extremism"
    f. "Domestic Violent Extremism"
    g. "Domestic Terrorism"
    h. Anarchist violent extremism"
    i. "Radical agitators"
    j. "Criminal organizers and instigators"
    k. "Violent instigators"
    l. "Antifa"; and
    m. "Far-left extremists."

4. Records describing the process and/or procedures individuals may use to find out whether and what information about themselves has been collected and maintained by JTTFs and fusion centers, and the process by which any inaccurate information may be challenged and expunged.

**(Ex. A.)**

    7.    Upon receipt of Plaintiffs' request, the FBI determined that the information requested fell into four distinct subject categories. As such, Plaintiffs' request was split into four separate FOIAs to be handled individually as indicated below.

| Request Item | FOIA Number Assigned |
|---|---|
| 1 (a-e) | NFP-161243 |
| 2 (a-b) | NFP-161245 |
| 3 (a-m) | NFP-161247 |
| 4 | 1637191-000 |

FOIA REQUEST NUMBER NFP-161243

4

8.      By letter dated June 5, 2024, the FBI acknowledged receipt of item one of Plaintiffs' FOIA request and notified Plaintiffs it had been assigned FBI FOIPA Request Number NFP-161243. The FBI informed Plaintiffs that the FOIA provides for access to Government records where the records sought are "reasonably described." 5 U.S.C. § 552(a)(3)(A). The FBI advised Plaintiffs that it was closing the request because the request was overly broad. The FBI explained that the request did not provide sufficient detail to enable FBI personnel to locate potentially responsive records within the FBI's Central Records System (CRS) with a "reasonable amount of effort" and therefore, the request did not comply with the requirements of 28 C.F.R. § 16.3(b). The FBI provided several examples of information that could assist Plaintiffs in correcting the deficiency. Additionally, the FBI informed Plaintiffs that they could contact the FBI to ascertain how to reasonably describe their request by contacting foipaquestions@fbi.gov. Finally, the FBI informed Plaintiffs that they could appeal the FBI's response to the DOJ, Office of Information Policy (OIP) within 90 days of the date of the letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting the Office of Government Information Services (OGIS). **(Ex. B.)**

FOIA REQUEST NUMBER NFP-161245

9.      By letter dated June 5, 2024, the FBI acknowledged receipt of item two of Plaintiffs' FOIA request and notified Plaintiffs it had been assigned FBI FOIPA Request Number NFP-161245. The FBI informed Plaintiffs that the information requested is not considered a FOIA request because it was not in compliance with the FOIA and its regulations. Specifically, the FBI advised Plaintiffs that the FOIA does not require federal agencies to answer inquiries, create records, conduct research, or draw conclusions concerning queried data. Rather, the FOIA requires agencies to provide access to reasonably described, nonexempt records. The FBI

explained that the questions posed in the Plaintiffs' letter (part two) were not FOIA requests because they did not comply with the FOIA and its regulations. The FBI informed Plaintiffs that they could contact the FBI to ascertain how to reasonably describe their request by contacting foipaquestions@fbi.gov. Finally, the FBI informed Plaintiffs that they could appeal the FBI's response to OIP within 90 days of the date of the letter, contact the FBI's public liaison, and or seek dispute resolution services by contacting OGIS. **(Ex. C.)**

FOIA REQUEST NUMBER NFP-161247

10.    By letter dated June 5, 2024, the FBI acknowledged receipt of item three of Plaintiffs' FOIA request, and notified Plaintiffs it had been assigned FBI FOIPA Request Number NFP-161247. The FBI informed Plaintiffs that the subject requested is not searchable in the FBI's indices because the FBI's CRS is indexed according to investigatory interests, and is not arranged in a manner that allows for the retrieval of information in the form requested. The FBI advised Plaintiffs that the FOIA does not require federal agencies to answer inquiries, create records, conduct research, or draw conclusions concerning queried data. The FBI explained that the FOIA requires agencies to provide access to reasonably described, nonexempt records; therefore, the request was being closed. The FBI also informed Plaintiffs that they could contact the FBI to ascertain how to reasonably describe their request by contacting foipaquestions@fbi.gov. Finally, the FBI informed Plaintiffs that if they were dissatisfied with the FBI's determination, they could appeal the FBI's response to OIP within 90 days of the date of the letter, contact the FBI's public liaison, and or seek dispute resolution services by contacting OGIS. **(Ex. D.)**

FOIA REQUEST NUMBER 1637191-000

11.     By letter dated June 5, 2024, the FBI acknowledged receipt of item four of Plaintiffs' FOIA request, and notified Plaintiffs it had been assigned FBI FOIPA Request Number 1637191-000. The FBI informed Plaintiffs that records responsive to their request were available for review at www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/freedom-of-information-privacy-act. The FBI also informed Plaintiffs that additional information regarding the FBI's determinations was located at www.fbi.gov/foia. Further, the FBI advised Plaintiffs that if they were dissatisfied with the FBI's response, they could file an administrative appeal with OIP within ninety (90) days of the date of the letter, seek dispute resolution services by contacting OGIS, or contact the FBI's FOIA public liaison. **(Ex. E.)**

12.     By email dated June 18, 2024, Plaintiffs contacted the FBI's public liaison requesting clarification on whether the FBI's response to Request Number 1637191-000 was a refusal to conduct a search. The FBI responded on June 26, 2024, advising that the FBI's June 5, 2024 letter explains that the information sought by Plaintiffs was already made publicly available for review on the FBI's website. **(Ex. F.)**

PLAINTIFFS' ADMINISTRATIVE APPEALS TO THE OFFICE OF INFORMATION POLICY

13.     By electronic submission dated June 26, 2024, Plaintiffs submitted an administrative appeal to OIP challenging the FBI's determinations in response to all four FOIA request numbers: NFP-161243, NFP-161245, NFP-161247, and 1637191-000. Plaintiff also requested expedited processing of the appeal. **(Ex. G.)**

14.     By letters dated June 26, 2024, OIP acknowledged receipt of Plaintiffs' appeal of the FBI's determinations in all four requests and assigned each a separate appeal number. **(Ex. H.)**

7

| Request Item | FBI FOIA Number | OIP Appeal Number |
|---|---|---|
| 1 | NFP-161243 | A-2024-01981 |
| 2 | NFP-161245 | A-2024-01982 |
| 3 | NFP-161247 | A-2024-01983 |
| 4 | 1637191-000 | A-2024-01984 |

15.     By letter dated July 3, 2024, OIP responded to Plaintiffs' request for expedited

treatment stating that Plaintiffs had not met the burden of proof under 28 C.F.R §

16.5(e)(1)(ii)(2023) for expedited treatment. OIP explained that Plaintiffs' appeals would be

placed into chronological order with other pending appeals and addressed in turn. **(Ex. I.)**

FOIA LITIGATION 24-CV-5722

16.     On July 29, 2024, Plaintiffs filed a complaint in the U.S. District Court for the

Southern District of New York. (ECF No. 1)

17.     By letter dated September 10, 2024, OIP responded to Plaintiffs' appeal stating

that they had been made aware that Plaintiffs had filed a lawsuit, and per 28 C.F.R §

16.8(b)(2)(2023), OIP would be closing Plaintiffs' appeals. **(Ex. J.)**

FURTHER NARROWING OF THE ISSUES IN LITIGATION

18.     In approximately September 2024, Plaintiffs agreed to withdraw item four of their

FOIA request, so long as the FBI clarified the process for individuals to make requests for

information collected and maintained by JTTFs and fusion centers.  As explained to Plaintiffs

and memorialized herein, the FBI does not have a specific procedure for requesting individual

information and/or amending records that applies solely to records pertaining to JTTFs and/or

Fusion Centers. Any individual seeking such records should utilize the FOIPA procedures located

at the web address listed in the FBI's June 5, 2024 response in 1637191. *See supra* ¶ 11.

ADDITIONAL PRODUCTIONS

19.    After the filing of this litigation, FBI reviewed Plaintiffs' request and determined

that certain portions of the information requested could be searched if Plaintiffs were willing to

narrow the focus of the records requested. Following discussions with Plaintiffs concerning

terms, offices, and portions of the request at issue, the parties agreed to the following search

terms and parameters:

| Request Item | FBI FOIA Number | Search Terms |
|---|---|---|
| 1 | NFP-161243 | The FBI will run searches of the Internal Policy Office and the Counter Terrorism Division for any records related to JTTFs and/or FCs created from January 20, 2017 to the present pertaining to the subjects listed in 1 a-e of the request. This search will include records that the FBI categorizes as final versions of policies, guidance, procedures, directives, advisories, memoranda, agreements, training materials, and formal legal opinions. |
| 2 | NFP-161245 | The FBI will run searches of the Counter Terrorism Division for any records created from January 20, 2017 to the present that include a) the number of individuals whose activities have been investigated through or by JTTFs and/or FCs and b) the number and names of groups whose activities have been investigated through or by JTTFs and/or FCs.  The terms used for this search will be made by the Counter Terrorism Division's subject matter experts because they are best suited to identify terms to locate the requested information. |
| 3 | NFP-161247 | The FBI will run searches of the Internal Policy Office and the Counter Terrorism Division for any records created from January 20, 2017 to the present, and will search using each individual term listed by Plaintiffs plus the following terms to narrow the results: + "definition" or "defined" or "define" or "defines" + "JTTF(s)" and/or "Joint Terrorism Task Force(s)" and/or "Fusion Center(s)."  The FBI will then manually review the pages located to ensure that they are within the scope above, and actually include |

| | | definitions of the terms as they related to Joint Terrorism Task Force(s) and/or Fusion Center(s). |
|---|---|---|
| 4 | 1637191-000 | The Plaintiff agrees to drop this portion of the request, as the FBI attests that it does not have a specific procedure for requesting/amending records that applies solely to Joint Terrorism Task Forces or Fusion Centers.  Requests for copies or amendments of these records should be submitted in accordance with the conventional FOIA / Privacy Act procedures. |

20.     The FBI then conducted a search using the terms and parameters outlined above in accordance with the parties' agreement. Responsive records were located as a result of this search and are further described in ¶¶ 29-33 *infra*.

21.     By letter dated February 28, 2025, the FBI made its first interim release of records to Plaintiffs, advising that 263 pages of records were reviewed, and 84 pages of records were being released in full or part, with certain information exempted pursuant to FOIA Exemptions 3, 5, 6, 7(C), 7(D), and 7(E). 5 U.S.C. § 552 (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E). Additionally, the FBI advised Plaintiffs that information was referred to other government agencies (OGAs) and the FBI would communicate with the Plaintiffs once the OGA responses were received. Lastly, the FBI advised Plaintiffs that although their request was in litigation, they could appeal the FBI's response to the DOJ, OIP, within 90 days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS. **(Ex. K.)**

22.     By letter dated March 31, 2025, the FBI made its second interim release of records to Plaintiffs, advising that 140 pages of records were reviewed, and 72 pages of records were being released in full or part, with certain information exempted pursuant to FOIA Exemptions 3, 5, 6, 7(C), and 7(E). 5 U.S.C. § 552 (b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). Additionally, the FBI advised Plaintiffs that information was referred to one or more OGAs and

the FBI would communicate with Plaintiffs once the OGA responses were received. Lastly, the FBI advised Plaintiffs that they could appeal the FBI's response to the DOJ, OIP, within 90 days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS. **(Ex. L.)**

23.     By letter dated April 8, 2025, the FBI made its final release of records to Plaintiffs, advising that 57 pages of records were reviewed, and 49 pages of records were being released in full or part, with certain information exempted pursuant to FOIA Exemptions 3, 6, 7(C), and 7(E). 5 U.S.C. § 552 (b)(3), (b)(6), (b)(7)(C), and (b)(7)(E). Lastly, the FBI advised Plaintiffs that they could appeal the FBI's response to the DOJ, OIP, within 90 days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS.[1] **(Ex. M.)**

## PART II: THE FBI'S CENTRAL RECORDS SYSTEM AND SEARCH METHODOLOGY

### THE FBI'S CENTRAL RECORDS SYSTEM

24.     The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI while fulfilling its mission and integrated functions as a law enforcement and intelligence agency, and in the fulfillment of its administrative and personnel functions. The CRS spans the entire FBI organization and encompasses the records of FBIHQ, FBI field offices, and FBI legal attaché offices worldwide.

---

[1] This release consisted entirely of documents about which the FBI had consulted with OGAs and that had been previously reviewed for release as "Referral/Consult" in connection with the February and March productions.

25.    The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subjects. The broad array of CRS file classification categories includes types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number consisting of three sequential components: (a) the CRS file classification number; (b) the abbreviation of the FBI office of origin (OO) opening the file; and (c) the assigned individual case file number for the particular subject matter.[2] Within each case file, pertinent documents of interest are "serialized," or assigned a number in the order which the document is added to the file, typically in chronological order.

*The Central Records System's General Indices and Indexing*

26.    The general indices to the CRS, comparable to a digital version of a library card catalog, function as the key to locating records within the enormous amount of information contained in the CRS. FBI personnel index information in the CRS by individual (person), organization (entity, place, or thing), or activity or event (e.g., terrorist attack or bank robbery) when information is deemed of sufficient significance to warrant indexing for future retrieval.[3] The entries in the general indices fall into two categories;

---

[2] For example, in fictitious file number "11Z-HQ-56789," "11Z" indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO, and "56789" indicates the assigned case specific file number.

[3] The FBI's Records Management Policy mandates that FBI personnel enter all federal records into an authorized FBI recordkeeping system. FBI personnel are responsible for managing records they create and receive, determining the record status for each potential record, and importing records into an electronic recordkeeping system. See FBI Records and Information Management Policy Guide, 1223PG (September 22, 2022) at pp. 11-12 and 25-28 (Sections 2.9 and 4.2.3) available    at    https://vault.fbi.gov/records-and-information-management-policy-guide-

a. <u>Main index entry</u>: A main index entry is created for each individual or non-individual (e.g., organization, event, or activity) that is the subject or focus of an investigation. Main subjects are identified in the case title of a file.

b. <u>Reference index entry</u>: A reference index entry is created for an individual or non-individual (e.g., organization, event, or activity) associated with an investigation, but who or which is not the main subject or focus of the investigation. Reference subjects are typically not identified in the case title of a file.

*Sentinel*

27.     FBI personnel access the general indices through Sentinel, the FBI's case management system (since July 1, 2012).

28.     FBI personnel rely on Sentinel to locate records and other types of documents to fulfill essential functions, such as: conducting criminal, counterterrorism, and national security investigations; conducting background investigations; performing citizenship and employment queries; and administering security screenings, to include presidential protection. Sentinel's index search methodology and function allow FBI personnel to query the CRS for indexed subjects in case files.

29.     However, the identification of records indexed to the subject of a FOIPA request does not automatically mean the indexed records are responsive. Index searches using the search functions available in Sentinel are the means by which potentially responsive records are located, but ultimately, a FOIPA analyst must review potentially responsive records against the specific parameters of individual requests. Responsiveness determinations are made once indexed records

---

1223pg/records-and-information-management-policy-guide-1223pg/view     (last     accessed     on March 22, 2025).

are gathered, analyzed, and sorted by FOIPA analysts who then make informed scoping decisions to determine the total pool of records responsive to an individual request.

ADEQUACY OF SEARCH

*Targeted Searches and Results*

30.      In response to most FOIA requests received by the FBI, the FBI conducts a search of the CRS to determine if the FBI has records about a particular subject. The CRS is where the FBI indexes information about individuals, organizations, events, or other subjects of investigative interest for future retrieval. Such information would reasonably be expected to be located in the CRS by the index search methodology. However, after reviewing Plaintiffs' FOIA request, the FBI determined that a standard search of the CRS would be unlikely to locate records potentially responsive to Plaintiffs' request because there is no specific indexable term associated with the records sought and the records are not directly connected with a specific investigation, subject, event, or initiative that would be indexed in the CRS.

31.      Therefore, the FBI took the extraordinary step of conducting a targeted search outside the CRS. Specifically, the FBI, via RIDS, conducted a targeted search of the Internal Policy Office (IPO) and the Counter Terrorism Division (CTD) because the FBI determined that these were the most likely locations to house responsive records since any policy documents would be located via a search of the IPO policy portal; any JTTF specific training, data, and guidance would likely reside with CTD as they are responsible for the program; and any definitions of the terms requested would either reside in policy documents located in the policy portal or within documents maintained by CTD.

32.      In accordance with the parties' agreement as to the revised terms and parameters of the request, as outlined above, *see supra* ¶ 20, the FBI, via RIDS, requested that CTD search for records pertaining to parts 1-3 of Plaintiffs' requests. CTD conducted a search of their

14

systems for responsive records created from January 20, 2017, through the date of search. This included a review of communications preserved in electronic or physical format; a review of internal systems containing memoranda, agreements, manuals, and training materials; and a review of electronic records maintained on computers. CTD performed tailored searches utilizing each individual term listed in NFP-161247 as well as relying on the subject matter expertise of individuals assigned to the division to identify any potentially responsive records. CTD located records potentially responsive to parts 1 and 3 of Plaintiffs' requests.

33.    The FBI, via RIDS, also conducted a search of the Internal Policy Office for records pertaining to parts 1-3 of Plaintiffs' request created from January 20, 2017, through the date of the search. RIDS conducted a search utilizing the terms "JTTF"; "Joint Terrorism Task Force"; and "Fusion Center."  RIDS also conducted searches utilizing each individual term listed in NFP-161247. RIDS located records potentially responsive to Plaintiff's requests.

34.    Plaintiffs have provided no information for the FBI to reasonably conclude that records responsive under the FOIA would reside in any other location and there is no indication from the FBI's targeted search efforts that responsive records would reside in any other FBI location. Thus, the FBI has searched all locations and files reasonably likely to contain potentially responsive records, and there is no basis for the FBI to conclude that a search elsewhere would reasonably be likely to locate responsive records under the FOIA.

**PART III: JUSTIFICATION FOR NON-DISCLOSURE UNDER THE FOIA**

35.    The FBI processed all records responsive to Plaintiffs' requests to achieve maximum disclosure consistent with the access provisions of the FOIA. Every effort was made to provide Plaintiffs with all reasonably segregable, non-exempt information. The FBI did not withhold any reasonably segregable, nonexempt portions from Plaintiffs. Further description of the information withheld, beyond what is provided in this declaration, could reveal the actual

exempt information or would employ finite resources only to produce disjointed words, phrases, or sentences, that would have minimal or no informational content.

BATES NUMBERING, JUSTIFICATION CODES, AND INDEX

36.     _Bates Numbering & Index:_ The FBI numbered all pages of its production consecutively as Bates pages FBI (24-cv-5722)-1 through FBI (24-cv-5722)-397. On the pages released in full and in part to Plaintiffs, these numbers are typically located at the bottom of each page. Additionally, an index that describes each document, the Bates number assigned to each page of the document, and the specific FOIA exemption(s) and justification code(s) asserted on each page withheld in full or part is included as an exhibit to this declaration. **(Ex. N.)**

37.     _Justification Codes:_ On the Bates-numbered pages provided to Plaintiffs and on pages withheld in full or part and accounted for in the FBI's index, the FBI further categorized its application of exemptions to better explain the nature of the information withheld pursuant to the provisions of the FOIA. Particularly, the FBI applied numerical codes that coincide with specific categories of exempt information. This declaration and index demonstrate that all information withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions or is so intertwined with non-exempt information that segregation is not possible without revealing the underlying exempt information.

38.     Each instance of information withheld pursuant to a FOIA exemption is accompanied by a coded designation that corresponds to one of the categories listed in the chart below.[4]  For example, if "(b)(7)(C)-1" appears on a page, the "(b)(7)(C)" designation refers to FOIA Exemption 7(C) protecting against unwarranted invasions of personal privacy. The

---

[4] The FBI has implemented standard codes for justification categories. Not all codes are applicable in each FOIA litigation; therefore, the codes in the below "Summary of Exemption Categories" chart may not be sequential if certain codes are not relevant to the records at issue.

numerical designation "1" following "(b)(7)(C)" narrows the main category into a more specific

subcategory, such as "Names and Other Identifying Information of FBI Special Agents and

Professional Staff. [5]

| SUMMARY OF FOIA EXEMPTION JUSTIFICATION CATEGORIES | |
| --- | --- |
| CODED CATEGORIES | INFORMATION WITHHELD |
| EXEMPTION (b)(3) | INFORMATION PROTECTED BY STATUTE |
| (b)(3)-5 | 50 U.S.C. §3024(i)(1) – Sources & Methods, Intelligence (The National Security Act of 1947) |
| EXEMPTION (b)(6) and EXEMPTION (b)(7)(C) | CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY AND UNWARRANTED INVASION OF PERSONAL PRIVACY |
| (b)(6)-1 and (b)(7)(C)-1 | Names and Identifying Information of FBI Special Agents and Professional Staff |
| (b)(6)-3 and (b)(7)(C)-3 | Names and Identifying Information of Third Parties Merely Mentioned |
| (b)(6)-4 and (b)(7)(C)-4 | Names and Identifying Information of Third Parties of Investigative Interest |
| (b)(6)-5 and (b)(7)(C)-5 | Names and Identifying Information of Personnel from Non-FBI Federal Agencies |
| (b)(6)-7 and (b)(7)(C)-7 | Names of Third Parties with Criminal Records |
| (b)(6)-8 and (b)(7)(C)-8 | Names and Identifying Information of Third-Party Victims |
| EXEMPTION (b)(7)(E) | INVESTIGATIVE TECHNIQUES AND PROCEDURES |
| (b)(7)(E)-1 | Sensitive Investigative File Numbers |
| (b)(7)(E)-2 | Identities and Locations of FBI Joint Units, Squads, and Divisions |
| (b)(7)(E)-3 | FBI Internal E-mail addresses, Non-public Web Addresses and Telephone Numbers, and Internal E-mail Tools |
| (b)(7)(E)-4 | Collection and Analysis of Information |
| (b)(7)(E)-5 | Focus of Specific Investigations |
| (b)(7)(E)-6 | Types and Timing of Investigations |
| (b)(7)(E)-7 | Database Information and Search Results |
| (b)(7)(E)-14 | Coordination with Other Government Agencies and State/Local Law Enforcement Agencies |
| (b)(7)(E)-26 | Training Resources |
| (b)(7)(E)-27 | Operational Directives Concerning Sensitive Investigative Techniques and Strategies |
| (b)(7)(E)-30 | Resource Allocation |

EXEMPTION 3 – INFORMATION PROTECTED BY STATUTE

39.     FOIA Exemption 3 exempts from disclosure information "specifically exempted

from disclosure by statute . . . if that statute (A)(i) requires that the matters be withheld from the

---

[5] Exemption (b)(3)-1 was inadvertently cited on Bates page 359. This code was applied in error and should be (b)(3)-5. This error is corrected in the Vaughn Index at Exhibit N. In addition, (b)(7)(D) was applied to Bates 218 and (b)(7)(E)-8 was initially cited on 15 pages of information; however, upon further review it was determined that the material did not rise to the level of being withheld under these codes and the FBI is no longer asserting these exemption codes on these records. Following this determination, the FBI did a thorough review of all redactions where these codes were used and determined that the information was correctly withheld per other exemptions and/or coded categories covering that same information.

public in such a manner as to leave no discretion on the issue; or (A)(ii) establishes particular

criteria from withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552

(b)(3). The OPEN FOIA Act of 2009 established an additional requirement that any statute

"enacted after the date of enactment of the OPEN FOIA Act of 2009, [must] specifically cite[] to

this paragraph" in order to qualify under Exemption 3.

<em>(b)(3)-5: 50 U.S.C. § 3024(i)(1) - Sources & Methods, Intelligence<br>(The National Security Act of 1947)</em>

40.     The FBI asserted Exemption 3 to withhold information pursuant to Section

102A(i)(1) of the National Security Act of 1947, as amended, National Security Act of 1947.

This statute provides that the Director of National Intelligence (DNI) "shall protect, and shall

establish and enforce policies to protect, intelligence sources and methods from unauthorized

disclosure."[6] As relevant to 5 U.S.C. § 552(b)(3)(B), the National Security Act of 1947 was

enacted before the date of enactment of the OPEN FOIA Act of 2009. On its face, this federal

statute leaves no discretion to agencies about withholding from the public information about

intelligence sources and methods. Thus, the protection afforded to intelligence sources and

methods by 50 U.S.C. § 3024(i)(1) is absolute. See CIA v. Sims, 471 U.S. 159 (1985).

41.     To fulfill its obligation of protecting intelligence sources and methods, the DNI is

authorized to establish and implement guidelines for the Intelligence Community (IC) for the

classification of information under applicable laws, Executive Orders, and other Presidential

Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1). In

implementing this authority, the DNI promulgated Intelligence Community Directive 700, which

---

[6] Section 102A(i)(1) of the National Security Act was previously codified at 50 U.S.C. § 403(i)(1). As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is now codified at 50 U.S.C. § 3024(i)(1).

provides that IC elements shall protect "national intelligence and intelligence sources and methods and activities from unauthorized disclosure."[7] The FBI is one of 18 member agencies comprising the IC, and as such must protect intelligence sources and methods. 50 U.S.C. § 3003(4).

42.      Given the plain Congressional mandate to protect the IC's sources and methods of gathering intelligence, the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiffs. Therefore, the FBI is prohibited from disclosing such information under 50 U.S.C. § 3024 (i)(1).[8]

43.      The FBI is asserting Exemption 3 in this case, at times in conjunction with 7(E), to protect information that would reveal intelligence sources and methods. In some instances, information was also withheld under Exemption 7(E) because these unclassified intelligence sources and methods were employed as law enforcement techniques, procedures, or guidelines, and thus would qualify as both an intelligence source and method under Exemption 3 and a law enforcement technique under Exemption 7(E). Notably, § 3024 (i)(1) protects sources and methods regardless of whether they are classified. See Sims, 471 U.S. at 176.

## EXEMPTION 7 THRESHOLD

44.      Before an agency can invoke any of the harms enumerated in Exemption 7, it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Pursuant to 28 USC §§ 533, 534, and Executive Order 12,333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM)

---

[7] Intelligence Community Directive (ICD) 700, dated June 7, 2012, at ¶ E.2.a
[8] Although 50 U.S.C. § 3024 (i)(1) does not impose a requirement to articulate harm, disclosure of this information presents a bona fide opportunity for individuals to develop and implement countermeasures, resulting in the loss of significant intelligence information, sources, and methods relied upon by national policymakers and the IC to safeguard national security

and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States. Under this investigative authority, the responsive records herein were compiled for the following specific law enforcement purposes.

45.     The records at issue concern policies and trainings developed to facilitate partnership with other law enforcement entities through participation in JTTFs; therefore, the FBI compiled the records at issue pursuant to its assistance to law enforcement function. As prescribed by AGG-DOM, paragraph III.C., the FBI may provide investigative assistance to state, local, and tribal enforcement agencies "in the investigation of matters that may involve federal crimes or threats to the national security, or for such other purposes as may be legally authorized."

46.     Additionally, the pertinent records were also compiled and/or created in furtherance of the FBI's law enforcement, national security, and intelligence missions. In order to accomplish these missions, the FBI must develop policy and training to ensure the efficient, effective, and lawful use of specific law enforcement and intelligence gathering techniques, procedures, and/or investigative methods in its investigations and in its assistance to law enforcement roles.

EXEMPTIONS 6 AND 7(C): UNWARRANTED INVASION OF PERSONAL PRIVACY

47.     Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal

privacy." 5 U.S.C. § 552(b)(6). All information that applies to a particular person falls within the scope of Exemption 6.

48.    Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[9]

49.    When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure. In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue. When withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure. For purposes of these exemptions, a public interest exists only when information about an individual, their name, or their identifying information[10] would shed light on the FBI's performance of its mission to protect the American people and uphold the Constitution of the United States, and its function to: protect the United States from terrorist attack; protect the United States against foreign intelligence, espionage, and nefarious cyber operations; combat significant criminal cyber activity, public corruption, transnational criminal enterprises, white-collar crime, and violent crime; and protect civil rights. In each instance wherein information

---

[9] The practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C). Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption 7(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under both exemptions.

[10] Hereafter, identifying information includes the following: residences, telephone numbers, employee ID numbers, and singular professional titles.

was withheld pursuant to Exemptions 6 and 7(C), the FBI determined that the individuals'
privacy interests outweighed any public interest in disclosure.

50.     Furthermore, considering privacy concerns are typically obviated once an
individual is deceased,[11] when processing FOIPA requests, the FBI takes several steps to
ascertain the current life/death status of the individuals whose names are withheld. The FBI uses
the birth date and/or the date of the investigation to determine whether an individual is living or
deceased, to the extent either or both of these pieces of information are discernable from the file.
The date of birth is used to apply the judicially recognized "100-year rule," i.e., if the individual
was born more than 100 years ago, the FBI presumes that he or she is dead and the name is
released. The FBI also uses institutional knowledge gained from prior FOIA requests or internal
records. By using institutional knowledge, the FBI can identify with sufficient certainty the
life/death status of certain individuals. If the FBI is unable to determine the life/death status of an
individual through the use of these methods, the name of the individual is withheld pursuant to
Exemptions 6 and 7(C), when it finds disclosure would constitute an unwarranted invasion of
those individuals' privacy should they still be living, and no public interest would be served in
releasing the names. It is also the FBI's policy to release names of high-ranking FBI officials as
well as individuals in public positions, as they have diminished privacy rights while acting in
their official capacity. This policy is applied to the individual's position at the time of the
document, and not the present.

---

[11] In some circumstances, surviving relatives of a deceased individual retain privacy interests in
their information, even after the individual's death. See generally National Archives v. Favish, 124
S. Ct. 1570 (2004).

*(b)(6)-1 and (b)(7)(C)-1: Names and Identifying Information of*
*FBI Special Agents and Professional Staff*

51.    Within Exemption category (b)(6)-1 and (b)(7)(C)-1, the FBI withheld the names and identifying information of FBI Special Agents (SAs) and professional staff. These FBI SAs and professional staff were responsible for conducting, supervising, and/or maintaining the investigative activities and administrative activities related to JTTF operations, reflected in the documents responsive to Plaintiffs' requests. These responsibilities included, but are not limited to, the following: coordinating/completing tasks in support of the FBI's investigative and administrative functions, compiling information, and/or reporting on the status of the investigations.

52.    *FBI Special Agents.* Assignments of SAs to any particular investigation are not by choice. Publicity, adverse or otherwise, arising from a particular investigation or the use of specific FBI investigative techniques, may seriously prejudice their effectiveness in conducting other investigations or performing their day-to-day work. The privacy consideration is also applied to protect FBI SAs, as individuals, from unnecessary, unofficial questioning as to the conduct of investigations and investigative activities, whether or not they are currently employed by the FBI. FBI SAs conduct official inquiries into various criminal and national security violation cases. The publicity associated with the release of an SA's identity in connection with a particular investigation and/or investigative activities could trigger hostility toward a particular SA. During an investigation, an SA may engage with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. Individuals targeted by such investigative activities, and/or those sympathetic to those targeted, could seek to inflict violence on an SA based on their participation in an investigation or in the deployment of certain investigative techniques. This is because an

individual targeted by such law enforcement actions may carry a grudge against those involved

with the investigation, which may last for years. These individuals may seek revenge on SAs and

other federal employees involved in particular investigative activities. There is no public interest

served by disclosing the SAs' identities because their identities would not, themselves,

significantly increase the public's understanding of the FBI's operations and activities. Thus,

disclosure of this information would constitute a clearly unwarranted invasion of their personal

privacy; and the FBI properly withheld the names and identifying information of FBI SAs

pursuant to Exemptions 6 and 7(C).

53.    *FBI Professional Staff.* The FBI also withheld the names and identifying

information of FBI professional staff pursuant to Exemptions 6 and 7(C). These FBI professional

staff were assigned to handle tasks related to the operations of JTTFs and/or the collection and

maintenance of records. Similar to FBI SAs, these FBI employees could be targeted for reprisal

based on their involvement in specific investigations/investigative activities. Furthermore, these

FBI professional staff were, and possibly are, in positions of access to information regarding

official law enforcement investigations, and therefore could become targets of harassing

inquiries for unauthorized access to investigations if their identities were released. Thus, these

individuals maintain substantial privacy interests in not having their identities disclosed. In

contrast, the FBI concluded that no public interest would be served by disclosing the identities of

these FBI professional staff to the general public because their identities would not, themselves,

significantly increase the public's understanding of the FBI's operations and activities.

Accordingly, after balancing these professional staff employees' substantial privacy interests

against the non-existent public interest, the FBI determined disclosure of their identities would

constitute a clearly unwarranted invasion of their personal privacy. Therefore, the FBI properly

withheld the names and identifying information of FBI professional staff pursuant to Exemptions 6 and 7(C).

54.    _FBI Unique Employee Identification Number._ The FBI withheld the Unique Employee Identification Number ("UEID") of an FBI Professional Staff member involved in the classification review of the records, pursuant to FOIA Exemptions 6 and 7(C). UEIDs are singular numbers assigned to employees and serve as a means of identification within the government. This unique identifier could be used to identify the employee who reviewed this document. This, in turn, could subject the employee to targeted attempts to obtain sensitive information from this guide or for other sensitive and/or classified FBI information to which they may have access due to their FBI employment.

55.    Furthermore, adversaries could co-opt the information to impersonate the employee's identity in relation to agency business. As such, the FBI determined this employee maintains substantial privacy interests in not having the UEID disclosed. In contrast, there is no public interest in this singular piece of information because its disclosure would not significantly increase the public's understanding of FBI operations and activities. Accordingly, on balance, this employee's privacy interests prevail and thus, the FBI properly withheld the UEID pursuant to FOIA Exemptions 6 and 7(C).

*(b)(6)-3 and (b)(7)(C)-3: Names and Identifying Information of*
*Third Parties Merely Mentioned*

56.    In Exemption category (b)(6)-3 and (b)(7)(C)-3, the FBI withheld the names and identifying information of third parties who were merely mentioned in the investigative records responsive to Plaintiffs' requests. The FBI has information about these third parties in its files because these individuals were tangentially mentioned in conjunction with FBI investigative efforts. These individuals were not of investigative interest to the FBI. These third parties

maintain substantial and legitimate privacy interests in not having this information disclosed and thus, being connected with FBI law enforcement matters. Considering the FBI is an investigative and intelligence agency, disclosure of these third parties' names and/or identifying information in connection with FBI records carries an extremely negative connotation. Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. The FBI then considered whether there was any public interest that would override these privacy interests, and concluded that disclosing information about individuals who were merely mentioned in an FBI investigative file would not significantly increase the public's understanding of the operations and activities of the FBI. Accordingly, the FBI properly protected these individuals' privacy interests pursuant to FOIA Exemptions 6 and 7(C).

### (b)(6)-4 and (b)(7)(C)-4: Names and Identifying Information of Third Parties of Investigative Interest

57. In Exemption category (b)(6)-4 and (b)(7)(C)-4, the FBI withheld the names and identifying information of third parties who were of investigative interest to the FBI. Being identified as a subject of FBI investigative interest carries a strong negative connotation and a stigma, whether or not these individuals ever committed criminal acts. Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Furthermore, it could result in professional and social repercussions, due to resulting negative stigmas. Accordingly, the FBI determined these individuals maintain substantial privacy interests in not having their identities disclosed. In contrast, disclosing personal information about these individuals would not significantly increase the public's understanding of the FBI's performance of its mission and so the FBI concluded that there was

no public interest here sufficient to override these individuals' substantial privacy interests. For

these reasons, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

*(b)(6)-5 and (b)(7)(C)-5: Names and Identifying Information of*
*Personnel from Non-FBI Federal Agencies*

58.     In Exemption category (b)(6)-5 and (b)(7)(C)-5, the FBI withheld the names and

identifying information of personnel from non-FBI federal government agencies who provided

information to or otherwise assisted the FBI in JTTF investigations, training, and/or policy

development and implementation. The rationale for protecting the identities of other government

employees is the same as the rationale for protecting the identities of FBI employees. See ¶¶ 50-

54, *supra*. Publicity, adverse or otherwise, concerning the assistance of these other agency

employees in FBI investigations and investigative activities would seriously impair their

effectiveness in assisting or participating in future FBI investigations and/or investigative

activities. The privacy consideration also protects these individuals from unnecessary, unofficial

questioning as to FBI investigations. It is possible for a person targeted by law enforcement

action to carry a grudge which may last for years, and to seek revenge on the personnel involved

in the investigations and investigative activities at issue in these FBI records. The publicity

associated with the release of their names and/or identifying information in connection with

these investigations and investigative activities could trigger hostility towards them by such

persons. Therefore, these employees maintain substantial privacy interests in not having their

identities disclosed in this context. In contrast, there is no public interest to be served by the

disclosure of these employees' names and/or identifying information because their identities, by

themselves, would not demonstrate how the FBI performed its statutory mission and thus, would

not significantly increase the public's understanding of the FBI's operations and activities.

Accordingly, the FBI properly protected these employees' privacy interests pursuant to FOIA Exemptions 6 and 7(C).

*(b)(6)-7 and (b)(7)(C)-7: Names of Third Parties with Criminal Records*

59.    Exemptions (b)(6)-6 and (b)(7)(C)-6 have been asserted to protect the names of third-party individuals who have a criminal record with the FBI and/or other law enforcement agencies. Being linked with any law enforcement investigation carries a strong negative connotation and a stigma. To release the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Accordingly, the FBI has determined that these individuals maintain a substantial privacy interest in not having their identities disclosed. In deciding whether to release the names and personal information concerning these third parties with criminal records, the public's interest in disclosure was balanced against the individual's right to privacy. It was determined that this information would not enlighten the public on how the FBI conducts its internal operations and investigations. Accordingly, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. The FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

*(b)(6)-8 and (b)(7)(C)-8: Names and Identifying Information of Third-Party Victims*

60.    In Exemption category (b)(6)-8 and (b)(7)(C)-8, the FBI withheld the names and identifying information of third-party victims. Releasing these individuals' identities in the context of these investigative records would cause embarrassment, as well as unsolicited and unnecessary attention to be focused on these individuals. Such a release could force them to relive emotionally trying events, causing further invasion of their privacy, in excess of the harms they've already been forced to endure. Thus, these victims maintain strong privacy interests in

the protection of such personal information. Furthermore, there is no legitimate public interest to be served by releasing the identities of these victims because their identities, themselves, would not shed light on the operations and activities of the FBI. The FBI determined disclosure of this information would constitute a clearly unwarranted invasion of these individuals' personal privacy, and consequently withheld this information pursuant to FOIA Exemptions 6 and 7(C).

EXEMPTION (B)(7)(E) INVESTIGATIVE TECHNIQUES AND PROCEDURES

61.    FOIA Exemption (b)(7)(E) provides protection for:

> law enforcement records [which]…would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7)(E).

62.    The FBI asserted Exemption 7(E) to withhold information from these records, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

63.    Within the responsive documents, the FBI applied Exemption 7(E) to non-public investigative techniques and procedures utilized by the FBI to pursue its law enforcement mission, and also to non-public details about techniques and procedures that are otherwise known to the public. Specifically, the FBI asserted Exemption 7(E) to protect the following categories of information.

*(b)(7)(E)-1: Sensitive Investigative File Numbers*

64.    In Exemption category 7(E)-1, the FBI protected sensitive investigative file numbers. The FBI determined this exemption is appropriate for protecting these file numbers as the release of file numbering convention identifies the investigative interest or priority given to

such matters. The file numbers the FBI protected are not known to the general public. These file numbers contain three separate portions. The first portions of these file numbers consist of FBI file classification numbers which indicate the types of investigative/intelligence gathering programs to which these files pertain. Many of the FBI's classification numbers are public, which makes disclosure of this information even more telling. Release of known file classification numbers in the context of investigative records would immediately reveal the types of investigations being pursued, and thus the types of investigative techniques and procedures available to FBI investigators, and/or non-public facets of the FBI's investigative strategies. For example, revealing the FBI has a money laundering investigative file on a subject who was only known to be investigated for crimes related to public corruption, would reveal key non-public information about the FBI's investigative strategies and gathered evidence. Additionally, releasing non-public FBI file classification numbers would reveal critical information about non-public investigative techniques and procedures, and provide criminals and foreign adversaries the ability to discern the types of highly sensitive investigative strategies the FBI is pursuing whenever such file classification numbers are present within these and other sensitive FBI investigative records.

65.    The protected investigative file numbers also contain two letter office of origin codes, indicating which FBI field office or overseas FBI legal attaché originated the investigations at issue. Providing this information, in many instances, would provide critical information about where and how the FBI detected particular criminal behaviors or national security threats, and reveal key pieces about the FBI's non-public FBI investigations or intelligence/evidence gathering sources and methods. Revealing this information could also risk disclosing unknown FBI investigations or intelligence gathering initiatives, by revealing interests

in varying areas of FBI investigative responsibility. Releasing this information could also possibly provide significant information about the FBI's failure to detect certain types of criminal behavior. For example, a criminal operating out of San Francisco, California with ties to a criminal organization under investigation in the FBI's Seattle Field Office, could request the FBI's Seattle Field Office's investigative file. If the FBI were to reveal all of the originating office codes in the investigative files present in Seattle's file, and there was no indication the FBI ever pursued an investigation in San Francisco, the criminal could reasonably assume the FBI failed to locate any evidence of their wrongdoing, emboldening them to continue their activities, undeterred.

66.    The third portion of these investigative files consists of the numbers given to the unique investigative initiatives these files were created to memorialize. Releasing these singular file numbers would provide criminals and foreign adversaries with a tracking mechanism by which they can place particular files/investigations within the context of larger FBI investigative efforts. Continued release of sensitive investigative file numbers would provide criminal with an idea of how FBI investigations may be interrelated and when, why, and how the FBI pursued different investigative strategies. This would provide criminals with a means of judging where the FBI allocates its limited investigative resources, how the FBI responds to different investigative circumstances, what the FBI knows and when/how they obtained the knowledge, and if there are knowledge gaps in the FBI's gathered intelligence.

67.    In summary, repeatedly releasing sensitive FBI investigative file numbers would allow determined criminals and foreign adversaries to obtain an exceptional understanding of the body of investigative intelligence available to the FBI; and where, who, what and how it is investigating certain detected activities. Release of this information would enable these criminals

and foreign adversaries to predict FBI investigations and structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law. Accordingly, the FBI properly asserted FOIA Exemption 7(E) to protect this type of information.

*(b)(7)(E)-2: Identities and Locations of FBI Joint Units, Squads, and Divisions*

68.     In Exemption category 7(E)-2, the FBI protected methods and techniques involving the location and identity of FBI units, squads and divisions involved in JTTF investigations and investigatory activity. Such office locations and their corresponding joint units, squads, and divisions are usually found in the administrative headings of internal FBI documents. These headings identify the locations of the office and the units, squads, and divisions that originated or received the documents. Disclosure of the location of these units, squads, and divisions conducting these kinds of investigations and investigative activity would reveal the targets, the physical areas of interest, and when taken together with the other locations if identified, could establish a pattern or "mosaic" that identification of a single location would not. If the locations are clustered in a particular area, it would allow criminals to avoid those locations, especially if one or more locations appeared with frequency or in a pattern. This would disrupt the method of the investigative process and deprive the FBI of valuable information.

69.     The withholding of the specific units, squads, and divisions involved is justifiable as well under a similar rationale. Once identified, the units', squads', and divisions' areas of expertise would become known and the targets of the investigations would be able to discern the investigative strategies deployed by the FBI. For example, knowing that a unit whose focus is on financial crimes is involved in an investigation is quite different information than knowing that the unit involved has a focus on crimes of violence. This knowledge could allow a subject to employ countermeasures targeted toward concealing particular types of behavior and/or allow

them to make informed decisions to avoid altogether certain activities in a particular location. Furthermore, certain FBI units/squads are highly specialized, and are involved in deploying particular investigative techniques and procedures. Revealing their involvement in an investigation would reveal non-public details concerning which techniques and procedures were deployed in certain investigative circumstances, and subsequently allow for criminals to predict the FBI's use of these techniques and procedures in similar investigative circumstances. This would allow for them to discover and circumvent the deployment of these techniques and procedures, greatly reducing their effectiveness.

70.    In summary, the FBI withheld the involvement of particular units, squads, and divisions to prevent criminals from adjusting their behavior and activities to circumvent FBI law enforcement efforts. Accordingly, the FBI properly asserted Exemption 7(E) to withhold this information.

*(b)(7)(E)-3: FBI Internal E-mail Addresses, Non-Public Web Addresses and Telephone Numbers, and Internal E-mail Tools*

71.    In Exemption category 7(E)-3, the FBI withheld internal e-mail addresses, non-public intranet web addresses and telephone numbers, and secure internal e-mail tools. More specifically, this type of information could provide criminals with specific targets for possible cyber-attacks and other types of attacks on FBI secure communications. Considering the current cyber-security environment where government data breaches and other hacking attempts on government systems are prevalent, it is likely that the release of this type of information could provide hackers with avenues to exploit the FBI's Information Technology system. It is possible they could use this information to gain unauthorized access to FBI systems, view and/or manipulate sensitive investigative data, interfere with the FBI's non-public intranet protocol, and/or hinder the FBI's ability to enforce the law by disrupting the FBI's internal

33

communications. Releasing this information poses substantial risks to FBI information systems, could potentially decrease the FBI's effectiveness, and could enable criminals to circumvent the law. Accordingly, the FBI asserted Exemption 7(E) to withhold this information.

*(b)(7)(E)-4: Collection and Analysis of Information*

72.     In Exemption category 7(E)-4, the FBI protected the methods the FBI uses to collect and analyze information it obtains for investigative purposes. The release of this information would disclose the identity of methods used in the collection and analysis of information, including how and from where the FBI collects information and the methodologies employed to analyze it once collected. Such disclosures would enable subjects of FBI investigations to circumvent similar currently used techniques. The relative utility of these techniques could be diminished if the actual techniques were released in this matter. This in turn would facilitate the accumulation of information by investigative subjects regarding the circumstances under which the specific techniques were used or requested and the usefulness of the information obtained. Release of this type of information would enable criminals to educate themselves about the techniques employed for the collection and analysis of information and therefore allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities. Accordingly, the FBI has properly withheld this information pursuant to FOIA Exemption 7(E).

*(b)(7)(E)-5: Focus of Specific Investigations*

73.     In Exemption category 7(E)-5, the FBI protected the focuses of specific FBI JTTF investigations. These focuses have not been publicly disclosed. Revealing this information to investigative targets would alert them to the FBI's interest in their activities, allowing them to

take active measures to conceal/destroy evidence or modify their behavior to avoid future investigative scrutiny. Additionally, revealing the broader investigative focuses of interconnected JTTF investigations would reveal the scope of the FBI's gathered evidence/intelligence resulting from such joint law enforcement efforts, connections it has discovered between different terrorist elements, and the strategies it plans to pursue to prevent or disrupt further criminal activities and/or national security threats. This would allow these terrorists elements to predict the FBI's investigative strategies, and modify their activities or operation security measures to thwart FBI investigative efforts. Additionally, release of this information in the context of the investigative records at issue would provide terrorist elements a preview of how the FBI will respond to similar investigative situations, allowing them to preemptively deploy countermeasures to disrupt FBI investigative efforts of their own, unrelated activities.

74.    Release of this type of information would also reveal key information about FBI intelligence gathering capabilities. Revealing when and why the FBI pursues or shifts investigative focuses would reveal key information about the types of investigative intelligence the FBI possessed at particular points in time, and possibly when and how such information was obtained. This could enable terrorist elements to discover non-public details about FBI intelligence/evidence gathering methods, and help them determine how they might modify their operational security to deprive the FBI of such critical intelligence/evidence.

75.    In summary, releasing the focus of specific FBI JTTF investigations would allow targets of these investigations to thwart FBI efforts to investigate/disrupt their activities; stunt the FBI's broader strategies for pursuing interrelated investigations; provide key information about FBI investigative strategies for pursuing JTTF investigations; and reveal key information about the FBI's intelligence/evidence gathering capabilities. Therefore, as release of this information

would enable criminals to circumvent the law, the FBI withheld this information pursuant to Exemption 7(E).

*(b)(7)(E)-6: Types and Timing of Investigations*

76.     In Exemption category 7(E)-6, the FBI protected information pertaining to the types and dates of investigations referenced in the records at issue in this case. Specifically, some of the information withheld, when referenced in connection with actual investigation and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation and the dates the FBI initiated the investigations. Disclosure of this information would inform criminals the types of activities that would trigger a full investigation as opposed to a preliminary investigation, and the particular dates the investigations cover. Additionally, this information would also give criminals valuable insight into how the FBI develops its investigations. Release of this information would allow investigative subjects to predict FBI investigative strategies and adjust their behavior accordingly. Moreover, revealing a specific activity in general warrants investigation could likewise cause individuals to adjust their conduct to avoid investigative scrutiny by the FBI.

77.     Within this category, the FBI also protected the categorization of sensitive FBI investigations. The specific type of investigation pursued to investigate certain matters is often highly sensitive. This is because internal FBI policies establish which types of investigative techniques are authorized for use in certain types of investigations. Thus, revealing how investigations are categorized by FBI personnel would reveal the investigative "toolbox" available to the FBI in certain situations. Releasing these investigation types would allow criminals to predict the FBI's responses and investigative strategies when pursuing certain types of criminal behavior/national security threats. Such a release would enable criminals to stay one

step ahead of FBI investigators and enable them to circumvent the law. Furthermore, revealing this information would also show the types of criminal behavior and/or intelligence discovered by the FBI that predicated the initiation of the particular investigation types. This could potentially reveal to criminals and national security threats key information about the FBI's intelligence sources and methods, and/or the FBI's capabilities to gather evidence of potential criminal activities through various investigative techniques. Disclosure could thus reveal key information about the FBI's investigative capabilities, allowing criminals to educate themselves on how they might avoid detection and/or disruption of their activities by FBI investigators.

78.    In summary, disclosure of information related to the types and timing of investigations could enable criminals to time and structure their illegal activities accordingly to circumvent the FBI's attempts to enforce federal laws; therefore, the FBI has properly withheld this information pursuant to Exemption 7(E).

### (b)(7)(E)-7: Database Information and Search Results

79.    In Exemption category 7(E)-7, the FBI protected the identities of sensitive investigative databases and database search results located through queries of these non-public databases used for official law enforcement purposes by the FBI. Releasing the identities of these databases and any information located through queries of these databases would give criminals insight into the available tools and resources the FBI uses to conduct criminal and national security investigations (i.e., the scope of information stored within the databases, how the FBI uses the databases to support its investigations, the types of information most valued by the FBI for particular investigations, and vulnerabilities of the databases).

80.    Revealing the use of these databases in the context of FBI investigative records, and the information generated through queries of these databases, would reveal the nature of

their utility to FBI investigators and the scope of information stored within the databases. Disclosing when and why the FBI queries these databases would reveal key information about FBI investigative strategies. This is because different investigative databases contain varying datasets, and revealing the types of data sought by investigators in particular investigative circumstances would reveal the FBI strategies employed in response to different investigative circumstances. Additionally, disclosing the search results for particular subjects would provide criminals with an understanding of the scope of FBI collected intelligence on particular subjects. It would expose possible intelligence gaps and/or intelligence gathering strengths. This would allow criminals to make informed decisions on how they might structure their behavior to exploit these strengths and weaknesses and avoid detection and/or disruption by the FBI.

81.    Revealing the types of information stored in these databases would also reveal the types of information most useful to FBI investigators. This would provide criminals with an understanding of how they might structure their behavior and/or deploy countermeasures to deprive the FBI of useful intelligence/evidence, thus jeopardizing the FBI's investigative mission.

82.    Finally, revealing the identities of these databases could jeopardize the FBI's investigative mission by revealing exactly where the FBI is storing and obtaining valuable investigative data. Knowing the database names makes the original source data an attractive target for compromise. It would allow criminals who gain access to FBI systems an idea of where they can go to discover what the FBI knows, how it gathered the information, and possible information regarding the FBI's investigative strategies. It would also offer these criminals the opportunity to corrupt or destroy information stored within these databases.

83.    In summary, release of the identities of sensitive investigative databases and database search results would impede the FBI's effectiveness and potentially aid in circumvention of valuable investigative techniques. Therefore, the FBI withheld this information pursuant to Exemption 7(E).

*(b)(7)(E)-14: Coordination with Other Government Agencies and State/Local Law Enforcement Agencies*

84.    Pursuant to Exemption category 7(E)-14, the FBI withheld specific details surrounding the FBI's coordination with other government agencies (OGAs) and state/local law enforcement agencies on investigative or intelligence information referenced in the records at issue. For example, the FBI is frequently contacted to provide expertise and/or advanced law enforcement techniques in support of investigations initiated by other agencies and law enforcement partners – such as DNA, crime scene, and behavioral analysis capabilities. Conversely, the FBI regularly relies on the expertise of local law enforcement to provide detailed local assessments and on the ground support in pursuit of the FBI's investigatory activities. Release of this information in the context of these records would reveal which types of investigative data the FBI deems relevant enough to refer to or collaborate with certain OGAs and/or state/local law enforcement agencies for further investigation. This would allow criminals to structure their behavior to avoid investigative triggers that would initiate an investigative referral from the FBI to its partners, and investigative scrutiny by additional government agencies or state/local law enforcement agencies. Additionally, release of this information could reveal which agencies cover specific types of investigative or intelligence matters. Repeated release of this type of information would enable criminals to predict and circumvent FBI investigative coordination with its government partners, state/local partners, and circumvent the

law enforcement purpose of these partnerships and information sharing techniques. Accordingly, the FBI properly asserted Exemption 7(E) to withhold this type of information.

*(b)(7)(E)-26: Training Resources*

85.     Within Exemption category 7(E)-26, the FBI protected sensitive training resources that not only describe non-public FBI investigative procedures, techniques, and strategies, but also instruct FBI employees on the proper use of these procedures, techniques, and strategies. If revealed in their entirety, these documents would provide individuals and entities with insight into the standards and practices the FBI follows when conducting investigations, and the suite of investigative tools it is likely bring to bear in particular circumstances. With such documents, criminal elements can connect and/or cross correlate the information within these trainings alongside with other details concerning location, times, and offices involved to map out the JTTF investigatory landscape. This would give criminals the ability to preemptively modify their behavior in a manner which avoids detection and disruption by the very investigative procedures, techniques, and strategies which these trainings instruct. Moreover, the fact that these trainings consolidate diverse sources of information and are often location, subject, and/or threat specific, makes their complete revelation even more problematic. While different entities and individuals may lack the capacity to gather discrete pieces of information to form a picture of the FBI's strategies, these trainings do that work for them when broad in nature and, conversely, provides specific insight into the geographic importance of certain trainings which would reveal where the FBI and its JTTF partners are concentrated and on what types of investigative activities they are focused. Consequently, the release of these trainings would increase the risk that targets of investigations could avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use these important national security and law

enforcement techniques. As release of such information would greatly increase the risk that potential lawbreakers would be able to evade detection and/or be emboldened to engage in criminal activities, this information has been redacted pursuant to FOIA Exemption 7(E).

*(b)(7)(E)-27: Operational Directives Concerning*
*Sensitive Investigative Techniques and Strategies*

86.    Within Exemption category 7(E)-27, the FBI protected operational directives that not only describe non-public FBI investigative procedures, techniques, and strategies, but also instruct FBI employees on the proper use of these procedures, techniques, and strategies. If revealed in their entirety, these descriptions would provide individuals and entities with insight into the standards the FBI follows when conducting investigations, and the suite of investigative tools its likely bring to bear in particular circumstances. This would give criminals the ability to preemptively modify their behavior in a manner which avoids detection and disruption by the very investigative procedures, techniques, and strategies which these operational directives are intended to regulate. Moreover, the fact that these operational directives consolidate diverse sources of information makes their complete revelation even more problematic. While different entities and individuals may lack the capacity to gather discrete pieces of information to form a picture of the FBI's strategies, these operational directives do that work for them. Consequently, the release of these operational directives would increase the risk that targets of investigations could avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use these important national security and law enforcement techniques. Essentially, release of such operational directives would reveal the FBI's overarching investigative strategies in pursing different types of criminal and national security investigations. For example, releasing operational directives concerning the creation and termination of Joint Task Forces and when and under what circumstances such task forces may be established or discontinued would provide

potential lawbreakers with a virtual playbook allowing them to modify their behaviors to limit

when and how the FBI and its law enforcement partners engage in cooperation under such a

program. Such a release would inform entities and individuals seeking to commit crimes or

threaten the United States' national security, the investigative steps FBI will take and when and

how they should modify their behaviors to avert the FBI's attempts to detect and/or disrupt their

activities. As release of such information would greatly increase the risk that potential

lawbreakers would be able to evade detection and/or be emboldened to engage in criminal

activities, this information has been redacted pursuant to FOIA Exemption 7(E).

*(b)(7)(E)-30: Resource Allocation*

87.    In Exemption category 7(E)-30, the FBI withheld the allocation of resources for

joint units, squads, and investigative activities across the JTTF program. This includes when and

under what circumstances the FBI and/or another JTTF member are responsible for providing

financial, personal, or material resources in support of specific JTTF activities. For example, task

force personnel may serve on more than one task force at any point in time with each task force

having a separate division or office responsible for providing the financial and personnel support

under their funded staffing level. By providing the details about when and under what

circumstances various divisions, offices, or agencies are responsible for providing such

resources, a potential criminal actor could tailor their activities or coordinate with other actors to

target components with lower funding levels and/or fewer resources. Releasing this information

would provide criminals attempting to circumvent the law insight into the amount of resources

allocated by the FBI and its law enforcement partners to certain JTTF units, squads, and

investigative activities. This information would, in turn, show how the FBI prioritizes its

allocation of resources to different events over time. With that knowledge, an informed criminal

would choose to move his or her operations to a different location where they would be less likely to be detected, and thus would be able to circumvent the law.

88.    In summary, the FBI withheld the allocation of resources for joint units, squads, and investigative activities across the JTTF program to prevent criminals from adjusting their behavior and activities to circumvent law enforcement efforts. Accordingly, the FBI properly withheld this information pursuant to Exemption 7(E).

## CONSULTATIONS WITH OTHER GOVERNMENT AGENCIES[12]

89.    The FBI consulted with the United States Marshals Service (USMS) concerning Bates pages: 24-cv-5722-264 – 24-cv-5722-310. USMS requested that information be withheld pursuant to FOIA Exemption 7(E). The Declaration of Kathleene Molen, attached hereto as **Exhibit O,** will address these withholdings.

90.    The FBI consulted with the Office of the Director of National Intelligence (ODNI) concerning Bates pages: 249-258; 324-326; 343-349; and 358-373. ODNI requested that the FBI assert Exemption 3, citing 50 U.S.C §3024(i)(1), on their behalf. The FBI withheld this information on ODNI's behalf for the reasons discussed in paragraphs 38-42, *supra.*

91.    The FBI consulted with the Department of Homeland Security (DHS) concerning Bates pages: 249-258; 324-340; 342-349; 358-360; and 370-378. DHS will be addressing their agency's withholdings in a separate declaration filed concurrently.

92.    The FBI consulted with the United States Immigration and Customs Enforcement (ICE) concerning Bates pages: 350-351; 380; 383; 385; 387-390; and 392-393. ICE requested

---

[12] In addition to the Exemptions cited by the OGAs on the Bates pages listed, many pages include withholdings by multiple agencies and the FBI in tandem. For a full list of exemptions and agencies asserting those exemptions on a page-by-page level, please see the coded Vaughn Index at Exhibit N.

that information be withheld pursuant to FOIA Exemptions 5, 6, 7(C) and 7(E). ICE will be addressing their agency's withholdings in a separate declaration filed concurrently.

93.    The FBI consulted with the Transportation Security Administration (TSA) concerning Bates pages: 236-237. TSA requested that information be withheld pursuant to FOIA Exemption 3. The Declaration of Christian Esteves, attached hereto as **Exhibit P**, will address these withholdings.[13]

## FORESEEABLE HARM STANDARD

94.    The FOIA Improvement Act of 2016 generally adopted the foreseeable harm standard and made it statutory, advising that agencies shall withhold information under the FOIA only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption or disclosure is prohibited by law. Accordingly, the FBI's analysis of records responsive under the FOIA is a two-part process. First, the FBI determines whether a record (or a portion of a record) is exempt pursuant to one or more FOIA exemptions. Second, if the record (or portion thereof) is exempt pursuant to one or more FOIA exemptions, the FBI then considers whether foreseeable harm would result from disclosure of the record (or portion thereof). For the withheld records at issue here (or portions of withheld records), the FBI conducted this two-part analysis and only withheld records (or portions of records) where it determined the withheld record (or portion) met both of these criteria. The FBI's foreseeable harm is more fully described within each of the above coded exemption justification categories.[14]

---

[13] Exemption (b)(5) was erroneously cited on Bates page 237. This code was applied in error and should be (b)(3). This has been corrected in the Vaughn Index in Exhibit N.
[14] 5 U.S.C. § 552(a)(8)(A)(i)(II) does not impose a requirement to articulate harm for Exemption (b)(3).

SEGREGABILITY

95.     As discussed in ¶ 4 *supra*, the FBI identified a total of 396 responsive pages: 50

Released in Full (RIF), 155 Released in Part (RIP), and 191 Withheld in Full (WIF). Each of

these categories is discussed below to further address segregability.

a.   <u>Pages RIF</u>. Following a line-by-line segregability review, RIDS determined 50

pages could be released in full without redaction as there was no foreseeable harm

to an interest protected by a FOIA exemption.

b.   <u>Pages RIP</u>. Following a line-by-line segregability review, RIDS determined 155

pages could be released in part with redactions per the identified FOIA

exemptions herein. These pages comprise a mixture of material that could be

segregated for release and material that was withheld as release would trigger

foreseeable harm to one or more interests protected by the cited FOIA exemptions

on these pages.

c.   <u>Pages WIF</u>. Following a line-by-line segregability review, RIDS determined 191

pages required withholding in their entirety. The FBI determined that all

information on 29 of these pages was either fully covered by one or more of the

cited FOIA exemptions or determined that any non-exempt information on these

pages was so intertwined with exempt material, no information could be

reasonably segregated for release. Any further segregation of this intertwined

material would employ finite resources only to produce disjointed words, phrases,

or sentences, that taken separately or together, would have minimal or no

informational content. The FBI also withheld 162 pages because they were

duplicates of pages accounted for elsewhere in the FBI's production. It is the

FBI's standard practice not to process duplicate pages, as doing so expends finite

processing resources with a net result of no additional information being released

to requesters.

## CONCLUSION

96.    The FBI performed adequate and reasonable searches for responsive records,

processed all such records, and released all reasonably segregable non-exempt information from

documents responsive to Plaintiffs' FOIA requests that are subject to FOIA. The FBI processed

the records under the access provisions of the FOIA to achieve maximum disclosure. Information

was properly withheld pursuant to FOIA Exemptions 3, 6, 7(C), and 7(E). The FBI carefully

examined the documents and determined the information withheld from Plaintiffs in this case, if

disclosed would reveal statutorily protected information; would cause a clearly unwarranted

invasion of personal privacy, or could reasonably be expected to constitute an unwarranted

invasion of personal privacy; and/or would disclose techniques and procedures for law

enforcement investigations. After extensive review of the documents at issue, the FBI determined

that there is no further non-exempt information that can be reasonably segregated and released

without revealing exempt information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through P attached hereto are true and correct copies.

Executed this __14th__ day of April 2025.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia